FREDDIE JAMES MCDOUGAL,

                    Plaintiff,

    v.                                        Case No. 19-cv-1413-pp

JAIME HARRIOT, *et al.*,

                    Defendants.

**ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO PROCEED WITHOUT PREPAYING FILING FEE (DKT. NO. 2), DENYING AS MOOT MOTION FOR ORDER FORCING INSTITUTION TO SEND CHECK (DKT. NO. 13) AND SCREENING COMPLAINT (DKT. NO. 1)**

The plaintiff, who is an inmate at Green Bay Correctional Institution and is representing himself, filed a complaint under 42 U.S.C. §1983, alleging that the defendants violated his civil rights. Dkt. No. 1. This order resolves the plaintiff's motion for leave to proceed without prepaying the filing fee, dkt. no. 2, denies as moot his motion for an order forcing Green Bay Correctional Institution to send a check to pay his initial partial filing fee, dkt. no. 13, and screens his complaint, dkt. no. 1.

**I.    Motion for Leave to Proceed without Prepaying the Filing Fee (Dkt. No. 2) and Motion for Order to Force Green Bay Correctional Institution to Send Check to Pay Fee (Dkt. No. 13)**

The Prison Litigation Reform Act applies to this case because the plaintiff was incarcerated when he filed his complaint. 28 U.S.C. §1915. That law allows a court to give an incarcerated plaintiff the ability to proceed with his lawsuit without prepaying the civil case filing fee if he meets certain conditions. One of

1

those conditions is that the plaintiff pay an initial partial filing fee. 28 U.S.C. §1915(b). Once the plaintiff pays the initial partial filing fee, the court may allow the plaintiff to pay the balance of the $350 filing fee over time, through deductions from his prisoner account. Id.

On October 1, 2019, the court ordered the plaintiff to pay an initial partial filing fee of $0.81. Dkt. No. 7. The court received that fee on December 26, 2019. The court will grant the plaintiff's motion for leave to proceed without prepayment of the filing fee. He must pay the remainder of the filing fee over time in the manner explained at the end of this order.

On October 1, 2019, the court issued the order requiring the plaintiff to pay the fee. Dkt. No. 7. A few days later, the court received from the plaintiff a motion for leave to use funds from his release account to pay the partial filing fee. Dkt. No. 8. The court granted that motion. Dkt. No. 9. Then on October 24, 2019, the court received from the plaintiff a motion asking for more time to pay the fee; he indicated that while he had the money to pay the fee, he didn't have a stamped envelope in which to mail it. Dkt. No. 10. The court granted him another extension. Dkt. No. 11. On November 27, 2019, the court received a letter from the plaintiff—he asked for a copy of the court's order authorizing him to pay the fee from his release account, explaining that the prison business office was telling him that they didn't receive the order. Dkt. No. 12. The court mailed a copy of the order to the plaintiff.

On December 17, 2019, the court received from the plaintiff a motion for an order "forcing" the prison to send the initial partial filing fee. Dkt. No. 13. He

indicated that even though he'd send the court's order to the business office "at least three times," "T. Debruin" kept saying she hadn't received it. Id. at 1. The plaintiff was concerned that "T. Debruin" was protecting the defendants by denying the plaintiff the ability to pay the initial partial filing fee. Id.

Nine days later, before the court had ruled on the plaintiff's motion, the court received the $0.81 initial partial filing fee. The court will deny the plaintiff's motion for an order forcing Green Bay Correctional to pay as moot.

## II. Screening the Complaint

### A. Federal Screening Standard

Under the PLRA, the court must screen complaints brought by prisoners seeking relief from a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint if the prisoner raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

In determining whether the complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case under Federal Rule of Civil Procedure 12(b)(6). See Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, accepted as true, to "state a claim for relief that is plausible on its face."

3

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). The court construes liberally complaints filed by plaintiffs who are representing themselves and holds such complaints to a less stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720 (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

B.    The Plaintiff's Allegations

The plaintiff has sued Corrections Officers Harriot and Hurst, Sergeants Linn, Reyes and Fugate, Captain Van Lannen, Lieutenant Wickman, Security Director John Kind and Warden William Pollard. Dkt. No. 1 at 1.

The plaintiff alleges that around 1:57 p.m. on February 27, 2019, he was in his cell at the treatment center, "which is a step 3 program segregation." Dkt. No. 1 at 2. He asserts that his cellmate, Kareem Body-Etti, was in a heated argument with another inmate named Steven Delap. Delap threatened to beat up and stab Body-Etti in front of defendant C.O. Harriot. Id. The

4

plaintiff says that Harriot told Delap that he was going to be released from segregation to general population, but that Delap said he did not want to go and refused to go. Id. at 2–3. When Harriot did a round, the plaintiff told Harriot that the plaintiff would take Delap's place (in general population). Id. at 3. The plaintiff says that Harriot laughed. Id. The plaintiff says he then told Harriot that Delap was threatening Body-Etti. Id. Delap then began threatening the plaintiff, saying he would "beat [his] a** when he got the chance." Id. Harriot ignored the plaintiff's statement and asked if the plaintiff wanted to shower. Id. The plaintiff said yes; Harriot opened the door and the plaintiff says that "we" gathered "our" hygiene items and walked toward the showers. Id. He says that "upon us" walking toward the showers, Delap threatened "us" and told the corrections officer (presumably Harriot) that he wanted to go to general population. Id.

The plaintiff says that "we" went in the shower, undressed and closed the shower door. Id. at 3-4. Harriot turned on the water "and proceeded without locking the showers." Id. at 4. The plaintiff explains that all segregation showers are supposed to be locked for the safety of inmates and staff. Id. The plaintiff alleges that Harriot "unlocked 7-10 inmates who were being released from segregation" to general population. Id. He says that when he and Body-Etti got out of the showers and started to get dressed, they noticed Delap standing in the doorway of the shower room, threatening to "beat [their] a**." Id. The plaintiff heard Harriot and defendant Sergeant Linnsen yell to Delap that he needed to go to the dayroom. Id. Delap refused "multiple directives,"

ran into the shower room and attacked the plaintiff when the plaintiff had his head in his shirt, trying to put it on. Id. Delap punched him and kneed the plaintiff multiple times. Id. The plaintiff tried to hold Delap but finally chose to defend himself after Delap landed multiple blows to his head. Id. The plaintiff was then sprayed in the face with a Mark3 OC canister by Harriot and defendant Sergeants Fugate and Reyes. Id. Delap kept swinging, so the plaintiff continued to defend himself. Id. "They" finally got Delap restrained, but he continued to wrestle with them until they handcuffed him and put him in the main segregation area. Id. The plaintiff lay down and "they" handcuffed him; he "informed" Captain Cushing (not a defendant) that the showers were supposed to be locked, and Cushing said that he and "the other inmate should be good and [get] released" from segregation. Id.

On March 4, 2019, the plaintiff spoke to defendant Lieutenant Andrew Wickman who told the plaintiff that he and "the other inmate" were responsible for the assault and they jumped "the other inmate" (presumably Delap). Id. The plaintiff asked how that was possible considering that they were drying off and the other inmate was getting released from segregation. Id. The plaintiff said even the corrections officers on his conduct report said that Delap "ran in on both of us and started swinging." Id. The plaintiff also told Wickman that "they" (presumably Harriot) did not comply with segregation rules, policies and procedures when "they" did not lock the shower door. Id. at 5. The plaintiff asserts that Wickman "disregarded" his reply and said Wickman would give the plaintiff 120 days disciplinary segregation. Id. The plaintiff said he would not

6

take that because he could sue for neglect and failure to protect. Id. He says Wickman again disregarded his reply and reminded the plaintiff that Wickman conducted the hearings. Id. Wickman advised the plaintiff that it wouldn't matter if the plaintiff had a hearing because Wickman had seen the videos and he still would give the plaintiff 120 days in segregation. Id. The plaintiff got upset and started yelling and cursing and telling Wickman that it wasn't fair and that Wickman was not supposed to serve his conduct report and then turn around and hear it. Id. Wickman laughed and walked away. Id.

The plaintiff saw Wickman again on March 6, 2020, and Wickman asked if the plaintiff wanted to take the 120 days in segregation because that's what he was going to get anyway. Id. The plaintiff said no. Id. Later that night, the plaintiff talked to C.O. Potts (not a defendant) who advised the plaintiff that if that was what the Lieutenant said, he might as well take the 120 days rather than "sit on dead time." Id. The plaintiff wrote the warden (defendant William Pollard), the security director (defendant John Kind) and defendant Captain Van Lanen about the situation. Id. He told them he would appeal "this" (presumably the 120-day sanction) and write a grievance. Id. He got no response. Id.

So, the plaintiff says, he wrote and accepted the 120 days but told "them" (he doesn't say who "them" is) that he would appeal because they forced and persuaded him to take the disposition, which was unfair and not due process. Id. The plaintiff wrote multiple inmate grievances about the assault in Step 3 program segregation and about the "unfair due process" with Lt.

7

Wickman. Id. Pollard denied his complaints, but a complaint examiner in Madison put them on "a prioritized investigation." Id.

Around 3:00 p.m. on March 21, 2019, the plaintiff was escorted from segregation recreation to a strip cage. Id. One of his hands was uncuffed and the other was tethered to the door. Id. The plaintiff informed "them" (he doesn't say who) that the handbook provides for a pat-down search, not a strip search, after inmates in segregation have recreation. Id. at 6. But "they" make all inmates get naked, squat and cough and lift their penis. Id. The plaintiff said that the whole time, there's another officer behind the glass watching. Id. He says that "they" ignored the plaintiff and told him to follow directives. Id. The plaintiff did: he got naked and followed strip search procedures. Id. The plaintiff alleges, however, that C.O. James Hurst asked the plaintiff to squat and cough multiple times, and that the plaintiff got uncomfortable. Id. He grabbed his clothes and started to dress, but Hurst continued to tell him to squat and cough. Id. The plaintiff replied that he did, but that Hurst probably couldn't see it because the plaintiff was cuffed to the door. Id. While the plaintiff was talking, Captain Van Lanen, who was standing at the door, told the plaintiff that he would put the plaintiff on the "200 wing" if the plaintiff did not follow directives. Id. The plaintiff responded that inmates were supposed to get pat searches; Van Lanen ignored him and told him to squat and cough. Id. Van Lanen told the plaintiff that "this is not [the plaintiff's] house this is his house." Id. The plaintiff responded that he didn't care and that his "time keep ticking." Id.

8

The plaintiff asserts that Van Lanen kept "provoking" him. Id. The plaintiff squatted and coughed, then got dressed; Van Lanen told C.O. Taylor (not a defendant) and C.O. Hurst to take the plaintiff to the 200 wing and put him in Room 233. Id. (The plaintiff previously had been housed on the 500 wing, where it was quiet and where inmates got their televisions and radios and some inmates even got restrictions. Id.) The plaintiff says he asked Van Lanen "is this the way it is," and that Van Lanen laughed. Id. The plaintiff was placed in Room 233 without hygiene products, a mattress, linens or his property "for hours." Id.

The plaintiff says that when dinner was served, Hurst and Taylor told him to go to the back of his cell and kneel. Id. The plaintiff responded that he was not on back-of-cell-restriction and that he would not do that just to eat. Id. Hurst told the plaintiff that he *was* on a back-of-cell restriction "due to Captain Van Lannen." Id. The plaintiff responded that he didn't believe Hurst and that he didn't do anything to deserve the restriction, so until he saw proof, he was not going to kneel just to eat. Id. So, the plaintiff says, Hurst and Taylor told him he couldn't eat. Id. The plaintiff says that he said okay and told them to turn on their body cameras; he says he informed them that if he found out they were lying, he was going to write them up. Id.

Later that day, Taylor told the plaintiff that the plaintiff wasn't on any restrictions—not even back-of-cell—and that "they" only did it because they knew the plaintiff was mad and Van Lanen told them not to give him anything until he cooled down. Id. at 6–7. The plaintiff said okay, took a shower, and a

9

couple hours later, received his property, his mattress and his linens. Id. at 7. That night, the plaintiff heard an inmate "disrespecting" him and found out it was Delap; he says that Delap was threatening to spit on him and keep the plaintiff up all night to the point that he couldn't sleep. Id. The plaintiff says it got so bad that the plaintiff needed medication to sleep. Id. The plaintiff says he found out that Delap was going home in two or three weeks. Id. The plaintiff wrote to Van Lanen but got no response, so he wrote to the security director, who told him to follow chain of command. Id. The plaintiff wrote the warden without response and filed multiple grievances and appeals that were rejected or dismissed. Id.

On March 28 or 29, 2019, the plaintiff was being served a conduct report for not squatting and coughing in the strip cage after recreation. Id. Wickman offered the plaintiff thirty days of segregation and loss of phone, but the plaintiff said he was not accepting that because he was not guilty and he hadn't talked to his family in fifty days. Id. Wickman asked why Wickman should help the plaintiff when Wickman recalled the plaintiff "calling him out of his name on the 500 wing." Id. The plaintiff responded that Wickman was mistaken—that that was not the plaintiff. Id. The plaintiff said he just couldn't take the sanction because his daughter's birth was coming up. Id. Wickman responded that the plaintiff would regret it. Id. At that point, the plaintiff said that he might consider it and that he'd let Wickman know. Id.

On Friday, the plaintiff wrote Wickman and said that he would like to take the thirty days "less of the phone" and that he'd be "off the day of" his

10

daughter's birthday. Id. The plaintiff says that "as usual," he heard nothing from Wickman. Id. The plaintiff says that a few days later, an education staff person named Weber came to the plaintiff's door, saying he was the plaintiff's advocate. Id. The plaintiff explained that he'd written to Wickman to accept the disposition. Id. On April 8, 2019, C.O. Yang (not a defendant) came to the plaintiff's cell to ask if the plaintiff wanted to attend the hearing. Id. The plaintiff told Yang that he took the disposition and that he should be "good." Id. Yang said he was going to check it out, but never came back. Id. Later, when officers passed out mail, the plaintiff received a disposition hearing sheet that stated he refused to attend the hearing; he says that Wickman gave him thirty days loss of phone and thirty days segregation. Id.

When the plaintiff saw Wickman, he asked Wickman why Wickman gave him another unfair due process hearing when Wickman knew that the plaintiff had written him and told multiple corrections officers and the plaintiff's advocate that he wanted to that the disposition "for loss of phone." Id. at 8. The plaintiff says that Wickman responded that Wickman had told the plaintiff that he would regret it. Id. The plaintiff protested that it was the second time Wickman had done this—first persuading the plaintiff to take 120 days in segregation when the plaintiff wanted to take a disposition, denying the disposition and giving the plaintiff more time than he was offered. Id. The plaintiff says that Wickman said, "Oh, well." Id. The plaintiff filed grievances. Id.

11

The plaintiff says that on May 29, 2020, he saw Van Lanen "for the 30th time in seg." Id. The plaintiff asked Van Lanen why Van Lanen kept lying to the plaintiff, telling the plaintiff he would be going to the treatment center or the 500 wing again at least ten times, but the plaintiff was still "on step 1 after 80 days in seg." Id. According to the plaintiff, all inmates are supposed to get reviewed for a "step" update every thirty days. Id. The plaintiff asserts that at one point, he was the only Step 1 on his side of the 200 wing besides one or two other people. Id. He relates that he had seen other inmates on restrictions get to Step 3—people who used the bathroom outside and who gamed conduct reports, but would get upgraded to Step 2 or Step 3. Id. The plaintiff says he told Van Lanen that he wasn't getting the proper treatment—he'd gotten no conduct reports except for the squatting and coughing "so whats the deal." Id. The plaintiff says he told Van Lanen that Van Lanen hold told the plaintiff after "120 days in seg" the plaintiff would do forty-five days in main segregation and then would be sent to the Step 3 unit (the treatment center) for two to four weeks. Id. Van Lanen replied that that was true. Id. The plaintiff then said to Van Lanen that he wasn't getting that type of treatment and that it was unfair for the plaintiff to be "doing all this time" for defending himself after he was attacked in segregation for a mistake the staff made. Id. The plaintiff says he told Van Lanen that two corrections officers wrote reports on his behalf and he still got 120 days and eighty days on Step 1. Id.

The plaintiff wrote an inmate complaint about the incident, and he wrote to Madison, but he used someone else's envelope. Id. The complaint examiner

told him that he couldn't use someone else's stamp and sent the complaint back. Id.

For relief, the plaintiff seeks $500,000; an order requiring the segregation showers to be locked at all times; better training for new corrections officers when it comes to communicating with inmates; and the investigation and firing of Wickman, Van Lanen, Pollard and Kind. Id. at 10.

C.    Analysis

The plaintiff first alleges that corrections officer Harriot failed to protect him in the showers, which resulted in his being attacked by Delap. "The Eighth Amendment's prohibition of 'cruel and unusual punishments' obligates prison officials to 'take reasonable measures to guarantee the safety of . . . inmates.' Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)." Sinn v. Lemmon, 911 F.3d 412, 419 (7th Cir. 2018). To state a failure-to-protect claim under the Eighth Amendment, the plaintiff must show that the defendants were deliberately indifferent to "an excessive risk to inmate health or safety[.]" Id. (quoting Gevas v. McLaughlin, 798 F.3d 475, 480 (7th Cir. 2015)). There are two components the plaintiff must demonstrate: "(1) 'the harm to which the prisoner was exposed must be an objectively serious one'; and (2) judged subjectively, the prison official 'must have actual, and not merely constructive, knowledge of the risk.'" Id. To demonstrate the second component, a plaintiff must show that "the official must both be aware of facts from which the inference could be drawn that a

13

substantial risk of serious harm exists, and he must also draw the inference."
Id. (quoting Farmer, 511 U.S. at 837, 114 S.Ct. 1970).

The plaintiff alleges that Delap threatened both himself and his cellmate, demonstrating a risk to safety. He also alleges that he told Harriot about Delap's threats to him and his cellmate and that Harriot did not lock the showers as he should have (per institution rules), thereby satisfying the requirement that Harriot knew the plaintiff was at risk of being harmed. And the plaintiff alleges that he suffered harm as a result of Harriot's failure to protect him. The plaintiff may proceed against Harriot under the Eighth Amendment.

Next, the plaintiff states a claim against Harriot, Fugate and Reyes for using excessive force, another Eighth Amendment claim. To state a claim that excessive force violated the Eighth Amendment's protection against cruel and unusual punishment, a plaintiff must allege that force used was used to cause harm rather than in a good faith effort to restore order. Harper v. Albert, 400 F.3d 1052, 1065 (7th Cir. 2009) (citing Hudson v. McMillian, 503 U.S. 1, 7 (1992)).

The plaintiff alleges that after Delap attacked him and he began defending himself, Harriot, Fugate and Reyes sprayed him in the face with a Mark3 OC canister. Dkt. No. 1 at 4. Though the plaintiff says he fought back against Delap, he asserts that he did so only in self-defense and only after his attempts to hold off Delap failed. At this early stage, the plaintiff has stated

sufficient facts to allow him to proceed on an excessive force claim against Harriot, Fugate and Reyes under the Eighth Amendment.

Next, the plaintiff alleges that Wickman denied him due process for the conduct report and subsequent disposition he received as a result of the shower room altercation. In the prison disciplinary context, due process requires that the inmate receive "advance written notice of the charges, the chance to present testimony and documentary evidence to an impartial decision maker, and a written explanation supported by at least 'some evidence' in the record, for any disciplinary action taken." Langstrom v. Kingston, 463 F.3d 621, 624 (7th Cir. 2006) (citations omitted).

The plaintiff alleges that Wickman offered him 120 days for the conduct report before the hearing. Dkt. No. 1 at 5. Wickman allegedly told the plaintiff that Wickman had seen the videos and that the plaintiff might as well take the 120 days since Wickman would be presiding over the hearing anyway. The plaintiff refused to accept the 120 days at first and again when Wickman asked a couple of days later. Id. The plaintiff eventually wrote to various prison officials, including the warden and the security director to say that he would accept the 120 days. Id. This claim is a close call; the plaintiff claims he did not receive due process, but he accepted the disposition. The court will allow the plaintiff to proceed on this due process claim, however, because the plaintiff appears to allege that he was tricked into accepting the disposition.

The plaintiff also alleges that Wickman denied him due process in relation to the conduct report the plaintiff received related to a strip search

15

conducted on March 21, 2019. In this instance, the plaintiff alleges he received a copy of the report along with an offer from Wickman for thirty days of segregation and loss of phone. Dkt. No. 1 at 7. A few days later, the plaintiff wrote to Wickman to accept at least part of the proffered disposition. A few days after that, a C.O. came to the plaintiff's cell to ask if the plaintiff wanted to attend the hearing for his conduct report. The plaintiff told the C.O. he'd written Wickman to accept the thirty-day disposition. Though the C.O. said he would look into it, he never returned. Later that day, the plaintiff received a disposition hearing sheet that said he refused to attend the hearing and giving him thirty days segregation and loss of phone. Id.

Again the plaintiff had accepted the disposition. When the C.O. came to his cell to ask about the hearing, he reiterated he'd accepted the disposition and declined to attend *because* he'd accepted the disposition. Even though there was some confusion and delay in the appropriate officials learning he'd accepted the disposition, he did in fact accept it. This, too, is a close call. As with the prior due process claim, however, the plaintiff implies that Wickman misled him—the plaintiff appears to have believed he would not lose his phone privileges. While it is not clear whether that was merely an assumption on the plaintiff's part or whether Wickman did something to encourage that belief, at this early stage, the court will allow the plaintiff to proceed on this due process claim against Wickman.

The plaintiff does state a claim under the Eighth Amendment related to the March 21, 2019 strip search itself. "In the context of bodily searches

performed upon those incarcerated in our prison system, only those searches that are maliciously motivated, unrelated to institutional security, and hence totally without penological justification are considered unconstitutional." Whitman v. Nesic, 368 F.3d 931, 934 (7th Cir. 2004). Prison officials are permitted to touch, pat down and search a prisoner in order to determine whether the prisoner is hiding anything dangerous on his person. Id. Even if a strip-search is justified, it still might violate the plaintiff's Eighth Amendment rights if it was "conducted in a harassing manner intended to humiliate and cause psychological pain." Mays v. Springborn, 575 F.3d 643, 649 (7th Cir. 2009); see also Fillmore v. Page, 358 F.3d 496, 505 (7th Cir. 2004); Calhoun v. DeTella, 319 F.3d 936, 939 (7th Cir. 2003).

The plaintiff alleges that all segregation inmates are (or, at least, were) subject to visual strip searches after going to recreation. Dkt. No. 1 at 6. The search included getting naked, squatting and coughing and lifting their penises. Id. As best the court can tell, defendant Hurst conducted the search on March 21, 2019 (the plaintiff says Hurst told him to squat and cough). Id. After the plaintiff tried to leave, Van Lanen stepped in and directed the plaintiff to squat and cough. Id. The court infers that the plaintiff is alleging the defendants did not have a penological purpose for the search, and that their decision to perform strip versus pat down searches was motivated by an intent to harass or humiliate the inmates, including the plaintiff. The plaintiff may proceed against Hurst and Van Lanen based on the strip search.

The plaintiff alleges that Van Lanen directed Hurst and Taylor (not a defendant) to take him to the 200 wing, which was louder than were he'd been housed (the 500 wing). Id. He was sent to the 200 wing without hygiene products, a mattress, linens, and his property "for hours." Id. Hurst and Taylor also demanded that the plaintiff go to the back of his cell and kneel to receive his dinner, and the plaintiff refused. It appears he missed one meal as a result (although he missed it because of his decision not to go to the back of the cell and kneel). Id.

Prisons "must provide inmates with 'the minimal civilized measure of life's necessities," Hardeman v. Curran, 933 F.3d 816, 820 (7th Cir. 2019) (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)), and a prison official who deprives an inmate of "'humane conditions of confinement'" violates the Eighth Amendment, Daugherty v. Page, 906 F.3d 606, 611 (7th Cir. 2018) (quoting Farmer v. Brennan, 511 U.S. 825, 832 (1984)). That deprivation must be "'objectively, sufficiently serious'" and the official must have acted with "'deliberate indifference to inmate health and safety.'" Id. (quoting Haywood v. Hathaway, 842 F.3d 1026, 1031 (7th Cir. 2016)).

The deprivations the plaintiff experienced were not sufficiently serious. He spent hours without a mattress, linens and his personal property. Dkt. No. 1 at 6. He missed one meal (that he presumably could have had had he gone to the back of the cell and knelt). Id. Hurst and Taylor came back later the same day to take the plaintiff to shower (where he presumably got back at least some of his hygiene products) and then, a few hours later, the plaintiff had a

18

mattress, linens and his property. Id. at 6–7. Being without a mattress, linens and personal property for a few hours and missing one meal is not enough to rise to the level of a constitutional violation. See Hudson v. McMillian, 503 U.S. 1, 9 (1992) (explaining that "extreme deprivations are required to make out" a claim about conditions of confinement).

The plaintiff says that Delap began threatening him the night after Hurst and Taylor moved him to the 200 wing. Dkt. No. 1 at 7. Delap said he would keep the plaintiff up all night. It got so bad that the plaintiff "had to get placed on sleeping meds." Id. The plaintiff doesn't say how long this lasted, but his allegation that Delap would be leaving in two to three weeks in combination with his allegation that he needed sleeping medication implies that the nightly disruptions occurred more than sporadically. That is enough to allege he suffered a serious deprivation. See King v. Frank, 328 F.Supp.2d 940, 946 (W.D.Wis.2004) (stating that severe and prolonged noise causing sleep deprivation may state Eighth Amendment claim). The plaintiff also alleges that he told Van Lanen, Kind (the security director) and Pollard (the warden) about the excessive noise, and that none of them took action. This is enough to allege that they were deliberately indifferent to the excessive noise at night. The plaintiff may proceed against Van Lanen, Kind and Pollard on this conditions-of-confinement claim under the Eighth Amendment.

Finally, the plaintiff alleges he was kept on the 200 wing longer than he should have been—and longer than other inmates with worse conduct records. Dkt. No. 1 at 8–9. The court sees two potential claims, neither of which is

viable. To the extent the plaintiff wants to bring a due process claim based on the classification that kept him on the 200 wing, that claim would fail under the law because "prisoners possess neither liberty nor property [interests] in their classifications and prison assignments." DeTomaso v. McGinnis, 970 F.2d 211, 212 (7th Cir. 1992).

Perhaps the plaintiff is trying to allege that officials kept him on the 200 wing in retaliation. To state a claim under the First Amendment for retaliation, a plaintiff must show: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation likely to deter such activity; and (3) the First Amendment activity was at least a motivating factor in the decision to impose the deprivation." Hawkins v. Mitchell, 756 F.3d 983, 996 (7th Cir. 2014). Though he alleges he was "charged up" after the shower fight and that he defended himself, fighting (or even defending himself) is not a protected activity under the First Amendment. While the plaintiff does not say so specifically, he may be alleging that Van Lanen was retaliating against him for complaining about the failure to lock the showers. Viewing the plaintiff's allegations liberally and in the light most favorable to him, the court will allow the plaintiff to proceed on a First Amendment retaliation claim against Van Lanen.

The court will dismiss defendant Linnsen. The only allegation the plaintiff makes against Linnsen is that he yelled at Delap to go into the dayroom during the shower fight incident. The plaintiff does not allege that

20

Linsen was otherwise involved with the showers or in breaking up the physical altercation.

### III. Conclusion

The court **GRANTS** the plaintiff's motion for leave to proceed without prepayment of the filing fee. Dkt. No. 2.

The court **DENIES** as moot the plaintiff's motion for order to force his institution to send a check to pay the initial partial filing fee. Dkt. No. 13.

The court **DIMSISSES** Linnsen as a defendant.

Under an informal service agreement between the Wisconsin Department of Justice and this court, a copy of the complaint and this order have been electronically transmitted to the Wisconsin Department of Justice for service on defendants Harriot, Fugate, Reyes, Hurst, Van Lanen, Wickman, Kind and Pollard. Under the informal service agreement, the court **ORDERS** those defendants to file a responsive pleading to the complaint within 60 days.

The court **ORDERS** that the agency that has custody of the plaintiff shall collect from his institution trust account the **$349.19** balance of the filing fee by collecting monthly payments from the plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to the plaintiff's trust account and forwarding payments to the clerk of court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. §1915(b)(2). The agency shall clearly identify the payments by the case name and number. If the plaintiff transfers to another county, state or federal institution, the

transferring institution must forward a copy of this order, along with the plaintiff's remaining balance, to the receiving institution.

The court will send a copy of this order to the officer in charge of the agency where the plaintiff is confined.

The court will issue a separate order **REFERRING** this case to Magistrate Judge Nancy Joseph for pretrial proceedings.

The court **ORDERS** that the parties may not begin discovery until after the court enters a scheduling order setting deadlines for discovery and dispositive motions.

The court **ORDERS** that plaintiffs who are inmates at Prisoner E-Filing Program institutions[1] must submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the court. Plaintiffs who are inmates at all other prison facilities must submit the original document for each filing to the court to the following address:

> Office of the Clerk
> United States District Court
> Eastern District of Wisconsin
> 362 United States Courthouse
> 517 E. Wisconsin Avenue
> Milwaukee, Wisconsin 53202

DO NOT MAIL ANYTHING DIRECTLY TO THE JUDGE'S CHAMBERS. It will only delay the processing of the matter.

---

[1] The Prisoner E-Filing Program is mandatory for all inmates of Green Bay Correctional Institution, Waupun Correctional Institution, Dodge Correctional Institution, Wisconsin Secure Program Facility, Columbia Correctional Institution, and Oshkosh Correctional Institution.

The court advises the plaintiff that if he fails to file documents or take other required actions by the deadlines the court sets, the court may dismiss the case based on his failure to diligently pursue it. The parties must notify the clerk of court of any change of address. The plaintiff is reminded that it is his responsibility to promptly notify the court if he is released from custody or transferred to a different institution. The plaintiff's failure to keep the court advised of his whereabouts may result in the court dismissing this case without further notice.

The court will include a guide prepared by court staff to address common questions that arise in cases filed by prisoners. Entitled "Answers to Prisoner Litigants' Common Questions," this guide contains information that the plaintiff may find useful in prosecuting his case.

Dated in Milwaukee, Wisconsin, this 29th day of September, 2020.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**