# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**FREDDIE JAMES MCDOUGAL, JR.,**

        **Plaintiff,**

v.                            Case No. 19-CV-1413

**JAMIE HERRIOT,** *et al.*,

        **Defendants.**

## DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

    Plaintiff Freddie James McDougal, Jr., who is confined at Milwaukee County Jail and representing himself, brings this lawsuit under 42 U.S.C. § 1983. (ECF No. 1.) McDougal was allowed to proceed on an Eighth Amendment failure to protect claim against defendant Jamie Herriot for failing to prevent an inmate from attacking him; an Eighth Amendment excessive force claim against defendants Herriot, Michael Fugate, and Jose Reyes for using OC spray during the inmate fight; an Eighth Amendment claim against James Hurst and Jay Van Lanen for allegedly conducting a strip search without penological purpose and with intent to harass or humiliate McDougal; and a Fourteenth Amendment due process claim against Andrew Wickman for the handling of the conduct reports related to these incidents.

    The defendants filed a motion for summary judgment (ECF No. 35.) For the reasons stated below, the defendants' motion for summary judgment is granted.

# FACTS

*The Parties*

During the relevant time period, plaintiff Freddie James McDougal, Jr. was incarcerated at Green Bay Correctional Institution. (ECF No. 37, ¶ 1.) Defendants Jamie Herriot and James Hurst were correctional officers employed at Green Bay. (*Id.*, ¶ 2.) Defendants Michael Fugate and Jose Reyes were correctional sergeants employed at Green Bay. (*Id.*, ¶ 4.) Defendant Jay Van Lanen was a captain employed at Green Bay, and Andrew Wickman was a lieutenant employed at Green Bay. (*Id.*, ¶¶ 6, 8.)

*Facts Related to the Inmate Fight*

On February 27, 2019, during a transfer of inmates from the Restricted Housing Unit (RHU) to general population, Herriot was escorting inmate Steven Delap to general population. (ECF No. 37, ¶ 11.) McDougal states that during the execution of the transport, Herriot stopped to ask him and another inmate, Karem Body-Etti if they would like to be let out for a shower. (ECF No. 47, ¶ 57.) Both McDougal and Body-Etti agreed, and Herriot escorted them to the shower area. (*Id.*) During the walk down the hall to the showers, Delap threatened McDougal and Body-Etti, stating that he was going to "kick our ass." (*Id.*, ¶ 11.) Herriot's response to Delap's comments was to instruct McDougal and Body-Etti to ignore Delap because it "was just talk," and McDougal acknowledges that Herriot did not consider Delap's threat to be serious. (*Id.*, ¶¶ 11, 57.) McDougal and Body-Etti then went into the shower area. (*Id.*) McDougal states that Herriot should have locked the door to the shower area or stood guard at the shower area. (*Id.*, ¶ 50.) The defendants note there is no policy requiring that the shower door should be locked in RHU and in fact, the door is kept

2

unlocked so staff can monitor the inmates showering and quickly respond to a security situation or medical need. (ECF No. 37, ¶ 49.)

Delap then stopped in a sallyport that was between the dayroom and the shower area. (ECF No. 37, ¶ 13.) Herriot ordered Delap to continue through to the dayroom, but Delap ignored Herriot's order and charged into the shower area. (*Id.*, ¶¶ 14, 17.) Herriot then yelled "Fight!" to alert other officers of the situation and went into the shower area. (*Id.*, ¶ 18.) Delap, McDougal, and Body-Etti were punching each other with closed fists. (*Id.*, ¶¶ 19-20). McDougal notes that he was primarily defending himself from the attack. (ECF No. 47, ¶ 30.) Both Herriot and non-defendant Officer Vandenplas ordered the inmates to stop fighting. (ECF No. 37, ¶ 21.) Herriot also sprayed his OC spray towards the faces of the inmates in an effort to compel compliance. (*Id.*, ¶ 22.) The inmates continued to fight. (*Id.*)

Defendants Fugate and Reyes reported to the shower area to assist in controlling the fight. (*Id.*, ¶ 25.) They both ordered the inmates to stop fighting several times, and when they did not comply, Fugate sprayed his OC spray. (*Id.*, ¶¶ 30-31.) Fugate's OC spray did not break up the fight, so Reyes sprayed his OC spray. (*Id.*, ¶¶ 32-33.) At this point, McDougal states that he was able to "clinch" Delap in defense and hold him until the officers intervened. (ECF No. 47, ¶ 29.) Fugate noticed that McDougal appeared to be impaired by the OC spray, and was losing the ability to defend himself. (ECF No. 37, ¶ 35.) At that point, Fugate decided to use physical force to subdue and stabilize Delap. (*Id.*, ¶¶ 35-36.) Once Fugate restrained Delap, Herriot directed McDougal to lay on his stomach so he could restrain him. (*Id.*, ¶ 39.) McDougal complied. (*Id.*) It is undisputed that the whole incident lasted approximately 30 seconds (ECF No. 47, ¶ 40.)

3

There is also video footage from Herriot's body camera of both the fight and some of the events leading up to the fight. (ECF No. 40-3.) The video shows that Herriot lets an inmate through the sallyport near the shower area. (*Id.* at 0:01-0:45.) There is another inmate lingering in the sallyport near the shower area. (*Id.* at 0:45-0:49.) Herriot can be heard addressing this inmate as "Delap" and ordering him to "go over there." (*Id.* at 0:49-0:57.) Delap then runs into the shower area and Herriot immediately responds, yelling "Fight!" (*Id.* at 0:57-1:02.) Several other officers also immediately respond to the situation. (*Id.*) Herriot sprays OC spray into the shower area to stop the fight. Several officers, including Herriot, order the inmates to stop fighting several times. (*Id.* at 1:10-1:27.) The inmates do not respond to the orders. (*Id.*) At this point, Herriot appears to spray himself with OC spray obscuring the view slightly, but the video shows another officer pulling Delap from the shower area and restraining him. (*Id.* at 1:28-1:34.) McDougal then responds to orders to emerge from the shower area; he cooperates with being restrained. (*Id.* at 1:34-2:00).

*Facts Related to the March 21, 2019 Strip Search*

On March 21, 2019, McDougal was coming in from recreation time, and defendant Hurst escorted him to a separate room for a routine strip search. (ECF No. 37, ¶ 68.) At the time, Green Bay had a policy to strip search all inmates coming back from recreation time to make sure contraband items did not make their way into RHU. (*Id.*, ¶¶ 70-71.) Green Bay was experiencing increased incidents of self-harm and enacted the policy to prevent medication and small razor blades from making their way into the RHU population. (*Id.*)

In preparation for the search, Hurst tethered one of McDougal's hands to the door of the search room, pursuant to a policy enacted to prevent an inmate from destroying or

4

consuming contraband during the search. (*Id.*, ¶ 76.) During a strip search, an inmate is directed to remove all his clothing and hand it over to the searching officer to be placed out of the inmate's reach. (*Id.*, ¶ 64.) Then, the officer visually inspects the inmate's body, including hair, ears, mouth, nose, hands, armpits, groin, rectum, between the toes, and the bottoms of the feet. (*Id.*) Part of the visual inspection of an inmate's rectum is to direct an inmate to "squat and cough" because that area is a known hiding place for contraband. (*Id.*, ¶¶ 77, 84.)

Hurst instructed McDougal to squat and cough, and according to defendants, McDougal did not adequately perform the act. (*Id.*, ¶ 78.) McDougal says he did squat and cough, but because he was tethered to the door and is tall, he had a hard time squatting and coughing. (ECF No. 47, ¶ 65.) Hurst then directed McDougal to squat and cough two more times. (ECF No. 37, ¶ 79.) At that point, defendant Van Lanen, who was supervising the search, intervened and directed McDougal to squat and cough. (*Id.*) According to McDougal, Van Lanen began yelling at him to comply with the directive to squat and cough in an attempt to provoke him. (ECF No. 48 at 4.) McDougal "continued to ask questions" as the search ended, and his behavior caused Van Lanen to move him from the 500 wing in RHU to the 200 wing. (*Id.*) The 500 wing gives inmates in RHU more privileges, such as the use of a TV, radio, and typewriter. (ECF No. 37, ¶ 86.) The defendants state that McDougal was aggressive and verbally hostile, flashing gang signs, and making threats, such as threatening to behave in such a way that would require Van Lanen to "suit up", *i.e.,* put on tactile gear. (*Id.*, ¶¶ 80, 87-88.) McDougal disputes this, noting that his conduct report made no mention of such behavior. (ECF No. 47, ¶ 87-88.) It

is undisputed that McDougal eventually complied with the strip search and was escorted to a cell on the 200 wing without further incident. (*Id.*, ¶ 90.)

*Facts Related to McDougal's Conduct Reports*

McDougal received a conduct report both for the February 27, 2019 fight and for his behavior during the March 21, 2019 strip search. (ECF No. 37, ¶¶ 45, 93.)

After the fight on February 27, 2019, Herriot issued McDougal Conduct Report #4000 for assault and disobeying orders. (ECF No. 37, ¶ 45.) On March 4, 2019, defendant Wickman served the conduct report upon McDougal and offered him an uncontested disposition of 120 days in disciplinary segregation. (*Id.*, ¶ 46.) McDougal initially declined the offer. (*Id.*, ¶ 47). McDougal states he attempted to discuss the offer with Wickman, who told him regardless of whether McDougal decided to have a hearing on the conduct report, he was going to give McDougal 120 days in disciplinary segregation. (ECF No. 47, ¶ 47). After this conversation, McDougal decided going through with the hearing would be pointless, so he accepted the offer. (*Id.*) On March 7, 2019, Wickman acknowledged McDougal's acceptance of the uncontested offer and ordered a disposition of 120 days of disciplinary segregation. (ECF No. 37, ¶ 48.)

After the strip search on March 21, 2019, Hurst issued McDougal Conduct Report #7795 for disobeying orders and engaging in disruptive conduct. (ECF No. 37, ¶ 93.) On March 26, 2019, Wickman served McDougal with the conduct report and asserts that he offered McDougal an uncontested disposition of 30 days loss of phone and 30 days disciplinary segregation. (*Id.*, ¶ 94.) McDougal disputes this, stating that Wickman's offer was only for 30 days loss of phone, and he made no mention of 30 days in disciplinary segregation. (ECF No. 47, ¶ 94.) It is undisputed that McDougal declined the offer. (*Id.*, ¶

96.) However, McDougal asserts he changed his mind and wrote Wickman at a later time, accepting the offer. (*Id.*, ¶ 97.) Wickman states he was never made aware that McDougal changed his mind, and a hearing was set for April 8, 2019. (ECF No. 37, ¶¶ 96, 100-102.) McDougal was assigned an advocate, who met with McDougal prior to the hearing. (ECF No. 47, ¶ 97.) McDougal asserts that he told his advocate he didn't need to prepare for the hearing because he already notified Wickman that he was taking the uncontested disposition of 30 days phone time. (*Id.*)

On April 8, 2019, the defendants assert McDougal refused to attend the hearing on his conduct report. (ECF No. 37, ¶ 102.) McDougal states that he did not refuse to attend but told the officer who came to escort him to the hearing that it was unnecessary because he accepted the uncontested disposition. (ECF No. 47, ¶ 102.) Because McDougal did not attend the hearing, Wickman entered a disposition of 30 days disciplinary segregation and 30 days loss of phone. (ECF No. 37, ¶ 103.) McDougal asserts that Wickman told him for both conduct reports that he was going to get the same disposition whether he contested the conduct report or not. (ECF No. 47, ¶ 105.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary

7

judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

McDougal claims that the defendants violated his constitutional rights in several ways. McDougal claims that Herriot violated his Eighth Amendment rights when he failed to prevent Delap from attacking him. He also claims that Herriot, Fugate, and Reyes used excessive force in violation of his Eighth Amendment rights when spraying him with OC spray during the fight. He further claims that Hurst and Van Lanen violated his Eighth Amendment rights during the strip search on March 21, 2019 because they conducted it in a harassing and humiliating manner. Finally, McDougal claims that Wickman violated his Fourteenth Amendment due process rights in handling both his conduct reports related to

8

the above incidents. The defendants move for summary judgment on each of McDougal's claims.

### *Failure to Protect Claim Against Herriot*

McDougal claims that Herriot violated his Eighth Amendment rights when he failed to prevent Delap from attacking him. "A prison official is liable for failing to protect an inmate from another prisoner only if the official 'knows of and disregards an excessive risk to inmate health or safety.'" *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). This standard contains both an objective and subjective component. *Id.* "First, the harm to which the prisoner was exposed must be an objectively serious one." *Id.* Second, "the official must have actual, and not merely constructive, knowledge of the risk in order to be held liable; specifically, he 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference.'" *Id.* (quoting *Farmer*, 511 U.S. at 837).

An inmate beating up another inmate "clearly constitutes serious harm," *Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005), so the objective prong is satisfied. Regarding the subjective prong, "a prisoner needs to present direct evidence of the official's state of mind," and inferences from circumstantial evidence suffice." *Gevas*, 798 F.3d at 480. Typically, plaintiffs in failure to protect situations demonstrate officials had actual knowledge by presenting evidence that they complained to the official about a specific threat. *Id.* However, "[c]omplaints that convey only a generalized, vague, or stale concern about one's safety typically will not support an inference that a prison official had actual knowledge that the prisoner was in danger." *Id.* at 480–481.

9

Here, the circumstances surrounding Delap's perceived threat do not demonstrate that Herriot had actual knowledge of a substantial risk of serious harm. While it is undisputed that Delap made a statement that he was going to kick McDougal's and Body-Etti's "asses," there is no evidence in the record indicating that Herriot knew that Delap was likely to make good on his threat. In *Gevas*, the Seventh Circuit Court of Appeals found that a plaintiff demonstrated actual knowledge where he identified the individual threatening him to the defendants; told the defendants the nature of the threat; and "supplied context that rendered the threats plausible (including [the inmate's] remark that Gevas had 'snitched' on a prior cellmate)." *Id.* at 481. What is missing in McDougal's case is the context. McDougal presents no evidence demonstrating that he had been previously threatened by Delap or that he and Delap had a history of conflict, or there was a keep-separate order in place that Herriot knew about and disregarded. The evidence shows that even after McDougal heard the threat, and Herriot dismissed it as "just talk," he did not press the matter with Herriot further and instead went to shower. Also, McDougal admits as true that Herriot did not believe that Delap was making a serious threat. (*See* ECF No. 47, ¶¶ 11, 47.) Thus, McDougal fails to demonstrate that Herriot had actual knowledge that Delap posed a substantial risk to McDougal's safety prior to the attack.

McDougal also argues that Herriot failed to protect him because he did not lock the shower area in RHU or stand guard by the shower area, thereby allowing Delap to charge into the shower area and start assaulting him. However, failing to lock the shower area or stand guard is negligence at best, and "negligence or even gross negligence is not enough to show a constitutional violation." *Giles v. Tobeck*, 895 F.3d 510, 513 (7th Cir. 2018). "Instead, the official's response must be so inadequate that it amounts to a reckless disregard for the

10

risk, and 'effectively condones the attack.'" *Id.* (quoting *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010)). In *Giles*, the defendant prison guards failed to escort a detainee, who was known to be violent, back to his prison cell, instead ordering him to go back to his cell and trusting he would do so on his own. *Id.* The detainee, instead of going back to his cell as ordered, sprinted to another cell and began beating up the occupant. *Id.* The Seventh Circuit held that while escorting the detainee would undoubtedly have been the better choice, the officer's "actions did not cross the line from negligently enabling the attack to recklessly condoning it." *Id.* at 514. Similarly, here, while Herriot could have taken more precautions, the fact that he did not lock the shower area or stand guard does not amount to recklessly condoning Delap's attack.

Additionally, as the video footage shows, as soon as Herriot realized that Delap moved to go into the shower area, he immediately intervened. He alerted other officers that there was a fight in progress and took measures, such as using OC spray, to attempt to break up the fight. Thus, no reasonable factfinder could conclude that Herriot had actual knowledge of a substantial risk of serious harm to McDougal or that Herriot's actions amounted to a reckless disregard of a substantial risk of serious harm. The Eighth Amendment failure to protect claim against Herriot is dismissed.

*Excessive Force Claim against Herriot, Fugate, and Reyes*

Next, McDougal claims that Herriot, Fugate, and Reyes used excessive force in violation of his Eighth Amendment rights when spraying him with OC spray during the fight. "Correctional officers violate the Eighth Amendment when they use force 'maliciously and sadistically for the very purpose of causing harm,' but not when they apply it in good faith to maintain or restore discipline." *Jackson v. Angus*, 808 Fed. Appx. 378, 382

11

(7th Cir. 2020) (quoting *Hudson v. McMillian*, 503 U.S. 1, 6 (1992)). Whether force is applied in good faith "turns on factors including the threat reasonably perceived by the guard, the need for and amount of force used, the efforts made to temper the severity of force used, and the injury suffered by the prisoner." *Boyd v. Pollard*, 621 Fed. Appx. 352, 355 (7th Cir. 2015). In considering these factors, if the officers' actions amount to unnecessary and wanton infliction of pain or "punishment that is 'so totally without penological justification that it results in the gratuitous infliction of suffering,'" then it rises to the level of a constitutional violation. *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). In other words, to establish an excessive force violation, a plaintiff must present "evidence that 'will support a reliable inference of wantonness in the infliction of pain.'" *Santiago*, 599 F.3d at 757 (quoting *Whitley v. Albers*, 475 U.S. 312, 322 (1986)).

It is undisputed that McDougal was engaged in an all-out brawl with Delap and Body-Etti. It is also undisputed that none of the inmates responded to verbal commands to stop fighting. The video footage confirms that none of the inmates responded to the blasts of OC spray or verbal orders to stop fighting. While McDougal may have been defending himself, he was still engaging in combative behavior and did not comply with the officers' commands. Indeed, DOC policy authorizes the use of OC spray to maintain order. McDougal presents no evidence that Herriot, Fugate, or Reyes deployed the OC spray for any reason other than to break up the fight. Also, while Fugate did physically go in to subdue and stabilize Delap, McDougal presents no evidence that Fugate's use of physical force was for any reason other than to stop the fighting. In short, McDougal does not present any evidence that the use of the OC spray or Fugate's use of physical force was for any reason other than to break up the fight and restore order. Thus, no reasonable factfinder

12

could conclude that the use of force was malicious or a wanton infliction of pain. Summary judgment in the defendants' favor on the Eighth Amendment excessive force claims against Herriot, Fugate, and Reyes is granted and the claims are dismissed.

*Eighth Amendment Claim Against Hurst and Van Lanen*

McDougal further claims that Hurst and Van Lanen violated his Eighth Amendment rights during the strip search on March 21, 2019 because they conducted it in harassing and humiliating manner Prison officials violate the Eighth Amendment when conducting strip searches only when the searches "are 'maliciously motivated, unrelated to institutional security, and hence totally without penological justification.'" *Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004) (quoting *Meriwether v. Faulkner*, 821 F.2d 408, 415 (7th Cir. 1987) (internal citations omitted)). Accordingly, a plaintiff must demonstrate that the strip search in question was "a search conducted in a harassing manner intended to humiliate and inflict psychological pain." *Calhoun*, 319 F.3d at 939.

McDougal presents no evidence demonstrating that the strip search was conducted in a harassing manner intended to humiliate him and that it was without penological justification. At most, he states that he was yelled at and forced to squat and cough more than once. His evidence shows that the search was uncomfortable and stressful, but while "strip searches may be unpleasant, humiliating, and embarrassing to prisoners, . . . not every psychological discomfort a prisoner endures amounts to a constitutional violation." *Id.* McDougal's experience is unlike the plaintiff's alleged experience in *Calhoun*, where the guards were making "ribald comments," sexually explicit gestures, and forcing the plaintiff to perform sexually provocative acts in front of female guards. *Id.* at 940. There, the Seventh

13

Circuit determined that amounts to a "strip search conducted in a manner designed to demean and humiliate" the plaintiff. *Id.*

It is also undisputed that the search was conducted pursuant to a reasonable prison policy and constituted a routine search. No reasonable factfinder could conclude that Hurst and Van Lanen conducted the strip search in a malicious manner and without penological justification. As such, summary judgment is granted in Hurst and Van Lanen's favor and the Eighth Amendment claims against them are dismissed.

*Due Process Claims Against Wickman*

Finally, McDougal claims that Wickman violated his Fourteenth Amendment due process rights in handling both his conduct reports related to the above incidents. McDougal has a due process claim only if he had a protected liberty interest in avoiding segregation. *Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th Cir. 2013). "Whether a prisoner has a liberty interest implicated by special confinement relies on whether the confinement imposed an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Id.* (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). To determine whether a plaintiff has a liberty interest, courts "look[] to 'the combined import of the duration of the segregative confinement *and* the conditions endured.'" *Id.* (quoting *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697 (7th Cir. 2009)) (emphasis in original). "Although relatively short terms of segregation rarely give rise to a prisoner's liberty interest, at least in the absence of exceptionally harsh conditions, such an interest *may* arise from a long term of confinement combined with atypical and significant hardships." *Id.* (emphasis in original). The Seventh Circuit has held that "a sentence of four months in segregation . . . is not so atypical and

14

significantly harsh that it creates a liberty interest." *Lisle v. Welborn*, 933 F.3d 705, 721 (7th Cir. 2019).

For Conduct Report #4000, McDougal received a disposition of 120 days (or 4 months). For Conduct Report #7795, McDougal received 30 days loss of phone privileges and 30 days in segregation. McDougal did not present evidence of any other factor, such as harsh conditions in segregation, that made his relatively short stays in segregation an "atypical and significant hardship." He also makes no argument that he has a liberty interest in phone privileges or that loss of phone privileges constitutes a significant hardship.

Even if he had established that he had a liberty interest, the evidence demonstrates that he received due process. "In the prison disciplinary context, due process requires only that the prisoner receive advance written notice of the charges, an opportunity to present testimony and documentary evidence to an impartial decision-maker, and a written explanation for the discipline that is supported by 'some evidence' on the record." *Piggie v. Cotton*, 342 F.3d 660, 662 (7th Cir. 2003). McDougal was served with notice for both conduct reports. For Conduct Report #4000, McDougal made the choice to accept the offer of 120 days in segregation instead of having a contested hearing. It is irrelevant that McDougal believed the hearing would be pointless because he still could have availed himself of the process regardless.

The same is true for Conduct Report #7795. The fact that there was a misunderstanding as to whether McDougal had accepted Wickman's offer and what the offer was is irrelevant. McDougal was told he had a contested hearing set. If he believed that the hearing was scheduled by mistake, he should have gone to the hearing and explained as much. Again, process was offered, but McDougal chose not to avail himself of it. Thus,

15

even when taking the facts in a light most favorable to McDougal, no reasonable factfinder could conclude that McDougal's due process rights were violated. Summary Judgment is granted in Wickman's favor and the Fourteenth Amendment claim against him is dismissed.

## CONCLUSION

Summary judgment in favor of the defendants is warranted on all of McDougal's claims. Regarding the Eighth Amendment failure to protect claim against Herriot, no reasonable factfinder could conclude that Herriot actually knew of a substantial risk of serious harm. Concerning the Eighth Amendment excessive force claims against Herriot, Fugate, and Reyes, no reasonable factfinder could conclude that those defendants used OC spray and physical force to break up the fight in a manner that was malicious or a wanton infliction of pain. As to the Eighth Amendment claims against Van Lanen and Hurst, no reasonable factfinder could conclude that the search was conducted in a malicious manner and without penological justification. Finally, as to the Fourteenth Amendment due process claims, no reasonable factfinder could conclude that McDougal's liberty interests were implicated, and even if they were, no reasonable factfinder could conclude that he was deprived of the requisite due process.

The defendants also argue that they are entitled to qualified immunity. Because I have granted the defendants summary judgment on the merits, I need not address the qualified immunity argument.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** the defendants' motion for summary judgment (ECF No. 35) is **GRANTED.**

16

Case 2:19-cv-01413-NJ   Filed 01/05/22   Page 16 of 17   Document 57

**IT IS FURTHER ORDERED** that the case is **DISMISSED**. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case

Dated at Milwaukee, Wisconsin this 5th day of January, 2022.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge